2003 UT 17

**In the Matter of the ESTATE OF Almon J. FLAKE, Deceased.**

**Marian R. Flake, Plaintiff and Appellant,**

v.

**Joel Flake, Defendant and Appellee.**

No. 20010478.

Supreme Court of Utah.

May 2, 2003.

Rehearing Denied June 17, 2003.

Matthew C. Barneck, Martha Knudson, Salt Lake City, for defendant.

Loren D. Martin, Salt Lake City, for plaintiff.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 Decedent's spouse, Marian Flake (Mrs. Flake), brought an action against the Almon J. Flake Family Trust, seeking enforcement of the trust dated September 22, 1987 (the 1987 Trust Agreement) and making numerous claims regarding her rights as a beneficiary. The 1987 Trust Agreement was purportedly modified or replaced by a subsequent trust document entitled Restatement of the Almon J. Flake Family Trust dated October 30, 1998 (the 1998 Restatement). The 1998 Restatement purported to change significantly many of Mrs. Flake's benefits as outlined in the 1987 Trust Agreement. Prior to the filing of any action, the parties met to discuss a possible settlement. Joel Flake, as trustee (the trustee) filed a motion before trial to enforce the settlement agreement that he claimed was reached on April 14, 1999 (the 1999 Settlement Agreement).

¶ 2 The trial court addressed the issues in two phases. In the first phase, the court considered whether the parties had reached an enforceable settlement agreement before the action was filed. The court held that the parties had reached a valid settlement agreement on several issues, but that there was no mutual release of claims. The second phase considered Mrs. Flake's claims of undue influence relating to the 1998 Restatement and the formation of JALCOM, L.L.C., a family limited liability company. The trustee filed a motion to dismiss, arguing that Mrs. Flake stated she had no evidence to offer and would rely solely on the documents at issue. The trial court granted the trustee's motion to dismiss in part. The court concluded that the 1998 Restatement did not fully supercede the 1987 Trust Agreement, specifically holding that under the 1987 Trust Agreement Mrs. Flake was entitled to monthly support from the trust. The court also determined that Mrs. Flake was entitled to receive the decedent's social security and retirement funds as outlined in the 1987 Trust Agreement.

¶ 3 Mrs. Flake appealed, arguing that the enforcement of an unexecuted agreement,

the 1999 Settlement Agreement, constitutes reversible error. She also contends that she held certain rights under the trust which can only be relinquished by express waiver. The trustee filed a cross-appeal arguing, among several issues, that the 1998 Restatement did in fact supercede the 1987 Trust Agreement. The trustee, therefore, contends that the Trust is entitled to a reimbursement of the support payments previously paid to Mrs. Flake. We affirm the trial court's granting of the trustee's motion to dismiss, but reverse the finding that the 1998 Restatement did not effect a revocation of the trust. We find that the 1998 Restatement fully replaced and superceded the original 1987 Trust Agreement. Therefore, the terms of the 1998 Restatement and subsequent 1999 Settlement Agreement govern the disposition of the trust estate.

## BACKGROUND

¶ 4 Almon J. Flake (Mr. Flake) and his first wife, Lois Flake, had five children. Mr. Flake's first wife subsequently passed away. On September 22, 1987, Mr. Flake executed the 1987 Trust Agreement by which he created the "Almon J. Flake Family Trust." Shortly thereafter, on October 5, 1987, Mr. Flake married Marian R. Flake. Article II of the 1987 Trust Agreement states that "[t]his trust is specifically designed for the use and benefit of the Undersigned Almon J. Flake, *and spouse,* for the lifetime of the Undersigned, then for the use and benefit of the Undersigned's children, except as contained herein" (emphasis added). The 1987 Trust Agreement made "Special Provisions" for Mrs. Flake. Article VII of the 1987 Trust Agreement provides as follows:

*SPECIAL PROVISIONS*

Upon the death of the Undersigned the Trust shall care for the needs of MARIAN R. FLAKE including her living arrangements in the home of the Undersigned or other reasonable living quarters which may include a unit in the Flake duplex, at her discretion.

. . .

B. The furnishings of the Flake home shall be used by Marian until her death as needed.

C. Marian shall also enjoy Almon's social security and all existing retirement funds.

. . .

F. Upon the death of Almon and Marian, all the remainder of this trust estate shall be distributed to the Flake children, share and share alike, per stirpes. THESE SPECIAL PROVISIONS SHALL TAKE PRECEDENCE OVER ANY AND ALL OTHERS OF THIS TRUST AGREEMENT.

¶ 5 The 1987 Trust Agreement also stated that the trust was revocable, and that Mr. Flake as settlor could amend certain portions of the trust, subject to the provisions of the trust language. Article XIII of the 1987 Trust Agreement:

*Revocation and Amendment*

A. As long as the Undersigned is alive, he reserves the right, without the consent or approval of any other, *to amend, modify, revoke, or remove from this Trust* the property that he has contributed, in whole or in part, including the principal and the present or past undisbursed income from such principal. (Emphasis added).

¶ 6 On October 30, 1998, Mr. Flake executed a document entitled the "Restatement of the Almon J. Flake Family Trust" (the 1998 Restatement), which states that "Almon J. Flake hereby *amends* and *restates in full* the Almon J. Flake Family Trust dated September 22, 1987." (emphasis added). In her brief, Mrs. Flake points out that Mr. Flake executed the 1998 Restatement during his final illness and within two weeks of his death. She also suggests that Mr. Flake's children facilitated the changes he made, significantly reducing the extent of her interest in the 1987 Trust Agreement. However, we note that while Mrs. Flake originally asserted a claim of undue influence in this case, during the second phase of trial, she declined to pursue her claim. We are therefore precluded from considering anything that might be relevant to a claim of undue influence. Article IX of the 1998 Restatement makes the following provisions for Mrs. Flake:

*Disposition at my Death*

C. *Vehicles.* If Marian R. Flake survives me she shall be distributed the Cadillac.

D. *Marian R. Flake.* If Marian R. Flake survives me, the main part of my home (located at 604 East 540 North in Centerville) shall be held in a separate trust as a life estate for her benefit. The trust shall pay the following costs associated with the property: property insurance, property taxes, electricity, heating fuel, water, and other city utilities. Marian R. Flake shall pay all other costs associated with the property including telephone charges and maintenance and upkeep costs. However, the Trustee shall have discretion to pay such part or all of the maintenance costs of the home that the Trustee feels is appropriate.

¶ 7 After Mr. Flake died on November 15, 1998, the parties disputed whether the 1987 Trust Agreement or the 1998 Restatement governed the disposition of the trust. The trustee's position was that the 1998 Restatement had entirely replaced the 1987 Trust Agreement. Mrs. Flake, however, contended that she was entitled to certain rights under the original trust agreement which could only be relinquished through express waiver. The parties met on April 14, 1999 in order to resolve their dispute and to discuss a possible settlement agreement. Mrs. Flake later filed a claim seeking enforcement of the original 1987 Trust Agreement. Pending the result of the litigation, Mrs. Flake filed a lis pendens on property subject to the trust, and argued that the recording of the lis pendens was done in order to give constructive notice that the property was subject to litigation. The trustee contends that Mrs. Flake improperly filed the lien and failed to provide notice within thirty days after recordation as required under Utah Code Ann. sections 38–12–102 and 103. Appellee also argues that Mrs. Flake failed to release the lien within twenty days as required under Utah Code Ann. section 38–9–4. After a series of motions and cross-motions, the trial court granted the trustee's motion to dismiss and ruled on the pending issue of the lis pendens.

**STANDARD OF REVIEW**

¶ 8 The validity of the trust is an issue of law, which we review for correctness. *Groesbeck v. Groesbeck (In re Estate of Groesbeck),* 935 P.2d 1255, 1257 (Utah 1997). The grant of a motion to dismiss is likewise a matter of law, which the appellate court reviews for correctness. *Thimmes v. Utah State Univ.,* 2001 UT App 93, ¶ 4, 22 P.3d 257, 258.

**ANALYSIS**

¶ 9 The determinative questions on appeal are as follows: (1) whether the trial court erred in concluding that the 1998 Restatement did not fully supercede the 1987 Trust Agreement; (2) whether the trial court erred when it found that section 75–3–912 of the Utah Uniform Probate Code is not applicable to nonprobate transfers, such as trust administration in decedent's estates, and therefore does not apply to the 1999 Agreement; (3) whether the trial court erred in failing to find that Mrs. Flake was estopped to make claims beyond the scope of the 1999 Settlement Agreement; (4) whether the trial court erred in failing to award attorneys' fees and costs relating to the lis pendens; and (5) whether the court should direct removal of the trustee. We reverse the ruling of the trial court as to the first issue, and affirm regarding the remaining issues.

¶ 10 In granting the trustee's motion to dismiss, the trial court found that the 1998 Restatement did not fully replace the 1987 Trust Agreement, and that the documents must be read together to determine the governing terms of the trust. We disagree, and hold that the 1987 Trust Agreement was entirely superceded by the 1998 Restatement. We further conclude that Mrs. Flake and the trustee reached an enforceable oral settlement agreement at a meeting held on April 14, 1999. However, the 1999 Settlement Agreement did not resolve all the issues between the parties, and thus did not include a release of claims nor did it preclude Mrs. Flake from asserting other claims against the trust to the extent they (1) are provided for in the 1998 Restatement and (2) were not discussed and agreed upon at the April 14, 1999 settlement meeting.

## I. THE TERMS OF THE 1987 TRUST AGREEMENT

¶ 11 A trust is an arrangement for the ownership of property. The nature of the arrangement is such that the legal title of the property is held by the trustee, but the benefit and enjoyment of the property resides with the beneficiaries. It is well settled that

> [a] trust ... is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held [the trustee] to equitable duties to deal with the property for the benefit of another person [the beneficiary], which arises as a result of a manifestation [by the settlor, or trustor] of an intention to create it.

*In re Estate of West*, 948 P.2d 351, 353 (Utah 1997) (citing Restatement (Second) of Trusts § 2 (1959)). There must be an intent by the settlor to confer a beneficial interest in the property in some other person. To create an inter vivos trust,

> [a] settlor must have an intent to create a presently enforceable trust, ... the trust property must be clearly specified and set aside, ... and the essential terms of the trust must be clear enough for the court to enforce the equitable duties that are the sine qua non of a trust relationship.

*Sundquist v. Sundquist*, 639 P.2d 181, 183–84 (Utah 1981) (citations omitted).

¶ 12 "A trust is a form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of beneficiaries." *Cont'l Bank & Trust Co. v. Country Club Mobile Estates, Ltd.*, 632 P.2d 869, 872 (Utah 1981)(citing Restatement (Second) of Trusts § 2 (1959)). The trustee has exclusive control of the trust property, subject only to the limitations imposed by law or the trust instrument, and "once the settlor has created the trust he is no longer the owner of the trust property and has only such ability to deal with it as is expressly reserved to him in the trust instrument." *Id.* (citation omitted). A trust must have an identifiable beneficiary who is capable of enforcing the equitable duties of the trustee. The transfer of property interests to the beneficiaries "can-

not be taken from them except in accordance with a provision of the trust instrument...." George G. Bogert & George T. Bogert, *Trusts & Trustees* § 998 (2d ed. rev.1983).

### A. Revocation

¶ 13 Absent fraud or mistake, a settlor "has the power to modify a trust only if and to the extent that such a power was reserved by the terms of the trust." *Kline v. Utah Dep't of Health*, 776 P.2d 57, 61 (Utah Ct.App.1989); *see also* Restatement (Second) of Trusts § 331. The same rule applies to a settlor's power to revoke a trust. Restatement (Second) of Trusts § 331. Ordinarily, if a power to modify is subject to no restrictions, then a reserved power to amend or modify includes the power to revoke. *Id.* cmt. h. However, the settlor cannot modify the trust if, by the terms of the trust, he did not reserve a power of modification. *Id.* Likewise, "[i]f the settlor reserves a power to modify the trust only in a particular manner or under particular circumstances, he can modify the trust only in that manner or under those circumstances." *Id.* cmt. d. However, as is the case with the 1987 Trust Agreement, if the settlor does not specify the method of modification, then "the power may be exercised by any method which sufficiently manifests his intention to modify the trust." *Id.* cmt. c. In interpreting the terms of a trust, the proper focus of inquiry is the settlor's intent. *Leggroan v. Zion's Sav. Bank & Trust Co.*, 120 Utah 93, 99, 232 P.2d 746, 749 (1951).

¶ 14 In Article XIII of the 1987 Trust Agreement, Mr. Flake expressly reserved both the power to modify and the power to revoke the trust created in 1987. The terms of the 1987 Trust Agreement state that the "Undersigned" reserves the right "to amend, modify, [or] revoke" the Trust, and thus it is clear that the settlor, Mr. Flake, reserved the right to amend, modify, or revoke.

### Revocation and Amendment

A. As long as the Undersigned is alive, he reserves the right, without the consent or approval of any other, to amend, modify, revoke, or remove from this Trust the

property that he has contributed, in whole or in part, including the principal and the present or past undisbursed income from such principal.

The 1998 Restatement clearly states that it amends the 1987 Trust Agreement.

¶ 15 We agree with the trial court's conclusion that the 1998 Restatement, absent an explicit revocation, is construed only as a modification of the 1987 Trust Agreement. However, we find that although the 1998 Restatement amended, or modified, the 1987 Trust Agreement and did not revoke it in its entirety, the terms and contents of the 1998 Restatement did fully supercede all of the operative provisions of the original 1987 Trust Agreement.

## B. Beneficiary Interests

¶ 16 This court recently held in *Banks v. Means*, 2002 UT 65, ¶ 14, 52 P.3d 1190, that a trust that specified revocation of a vested beneficiary interest through divestiture could only divest those beneficiary interests through a complete revocation of the trust. "Mrs. Banks reserved the power to revoke, modify, or amend the trust in whole or in part," and "limited that power in [a subsequent section] with regard to the beneficiaries." *Banks*, 2002 UT 65 at ¶ 12, 52 P.3d 1190. "[A] complete revocation [or termination] was required to divest the beneficiaries of their vested interest." *Id.* The appellant in *Banks* relied on *Groesbeck*, 935 P.2d 1255, arguing that the limiting language merely proved that the trust was not illusory and did not restrict the grantor's right to divest the beneficiaries of their vested interests. The court in *Groesbeck* held that a reservation of the power to revoke does not make a trust invalid. *Id.* at 1257. However, in *Banks*, this court noted that Mrs. Banks reserved the right to amend, modify, or revoke the trust, specified how such changes were to be accomplished, and created vested beneficiary interests that could be divested only through a complete revocation or termi-

nation of the trust. *Banks*, 2002 UT 65 at ¶ 14, 52 P.3d 1190.[1]

¶ 17 As in *Banks*, Mr. Flake reserved the right "to amend, modify, [or] revoke" the trust and later stated that the vested beneficiary interests shall continue until revocation or termination of the Trust other than by death. Here, Article XIV of the 1987 Trust Agreement states as follows:

### Vested Interest of Beneficiaries

The interest of the beneficiaries is a present vested interest which shall continue until the Trust is revoked or terminated other than by death.

The 1987 Trust Agreement language can be distinguished from the language used in *Banks*. The limiting language in *Banks* was subject to a beneficial interest that was to be revoked or terminated through a complete divestiture of that beneficial interest. The relevant language from the trust in *Banks* is as follows:

### Article III

### AMENDMENT, REVOCATION AND ADDITIONS TO THE TRUST

 3.2 *Interests of the Beneficiaries.* The interests of the beneficiaries are presently vested interests *subject to divestment* which shall continue until this Trust is revoked or terminated other than by death. (Emphasis added).

*Banks*, 2002 UT 65 at ¶ 4, 52 P.3d 1190. This language at issue lacks any reference to a *complete* divestiture. The beneficial interest of Mrs. Flake was merely amended, and not completely divested as was the case in *Banks*. The dispositive issue in the present case is whether there was a complete divestiture of a beneficial interest as in *Banks*, or whether there was simply a change in the quality, or scope, of the beneficial interest. We held in *Banks* that revocation was required when terminating a vested beneficial interest. 2002 UT 65 at ¶ 14, 52 P.3d 1190.

---

1. The trustee argues that to hold that a vested interest cannot be revoked or that the vested beneficiary assets cannot be modified is to nullify thousands of outstanding trust agreements. However, we do not hold that a vested beneficiary interest can never be revoked, but only that the revocation is subject to the terms of the individual trust agreement. Here, the trust agreement specifically states that the vested beneficiary interests can only be divested or revoked through a complete revocation or termination of the Trust.

Here, we find that there is no requirement of revocation where the beneficial interest is simply modified or amended but not terminated. Therefore, Mrs. Flake's beneficial interest, as amended, was completely outlined in the 1998 Restatement, inasmuch as the 1998 Restatement contained all of the operative provisions of the Almon J. Flake Family Trust. The purpose and primary effect of Article XIV in the 1987 Trust Agreement is to save the Trust from the doctrine of merger and to prove that the Trust is not illusory.[2]

## II. THE 1998 RESTATEMENT

¶ 18 We next examine whether the 1998 Restatement complied with the terms of the original trust and either (1) effected a revocation of the 1987 Trust Agreement or (2) was solely a modification as an amendment to the 1987 Trust Agreement.

¶ 19 The question concerns the effect and disposition of a "restated" trust agreement. The trial court held that absent an express revocation, the 1998 Restatement did not fully replace the 1987 Trust Agreement, and that the documents therefore must be read together to determine the governing terms of the trust. We disagree, and hold that the 1998 Restatement did, in fact, fully supercede the 1987 Trust Agreement.

¶ 20 The meaning of the term "restate" as it applies to an inter vivos trust document has not been established in Utah. We therefore look to other areas of trust law and the law of other states for guidance. In the law of business trusts, the meaning of a "restated" trust has been defined by statute in several states. These statutes address the meaning of a restated trust as it applies to various forms of corporate governance. For example, in Nevada "a certificate of trust may be restated by *integrating into a single instrument* all the provisions of the original certificate [or trust instrument], and all amendments to the certificate, which are then in effect or are to be made by the restatement." (Emphasis added). Nev.Rev. Stat. 88A.220(2) (2002); *see also* Del.Code Ann. __ 12 § 3810(c)(1) (2002); S.D. Codified Laws §§ 47–14A–45 (2002). Thus, state legislatures in some states have codified the meaning of a restated business trust, providing that a trust may be restated by integrating into a single instrument all of the operative provisions of the trust.[3]

¶ 21 In the Utah Revised Limited Liability Company Act (the Act), the Utah legislature addressed, in another context, the meaning of the term "restatement." Utah Code Ann. § 48–2c–409. The Act states that "[a] company may integrate into a single document all of the provisions of its articles of organization and amendments thereto, and it may ... further amend its articles of organization, by adopting restated or amended and restated articles of organization." *Id.* The Act further clarifies that a restated document that not only restates and integrates the operative provisions but that also amends the operative provisions shall so state with the appropriate language. *Id.* § 48–2c–409(2), (3). "If the restated articles only restate and integrate, and do not further amend the provisions of the articles of organization as previously amended or supplemented, and there is no discrepancy between those provisions and the provisions of the restated articles, they must so state." *Id.* § 48–2c–409(4)(b).

¶ 22 In this case, the 1998 Restatement was titled a "Restatement" and declared that

---

**2.** In *Groesbeck,* we held that a revocable trust can be created, without being deemed illusory, as long as title to the property passes to the trustee and vested interests are created in the beneficiaries, even if these interests are subject to divestiture. 935 P.2d at 1257–58 (citing *Horn v. First Sec. Bank of Utah, N.A.,* 548 P.2d 1265, 1267 (Utah 1976)). The relative Trust language in *In re Estate of Groesbeck* specified that "[t]he interest of the beneficiaries is a present interest which shall continue until this Trust is revoked or terminated other than by death." 935 P.2d at 1258. The reservation of a power to amend, modify, or revoke does not make a trust invalid or incom-

plete. *See* Restatement (Second) of Trusts § 331, cmt. j. As in *In re Estate of Groesbeck,* the vested beneficiary interests are subject to divestiture through operation of the specific provisions of the trust, namely the reserved power to amend, modify, or revoke.

**3.** We do not intend to imply that a trust may only be restated if it has been expressly authorized by statute; we merely look to these various statutes to clarify the meaning of the terms "restated" and "restatement" in the 1998 Restatement Agreement.

it "amend[ed] and restat[ed] *in full* " (emphasis added) the 1987 Trust Agreement. Although it did not detail the provisions of the trust that were specifically amended, as a restatement it merged all of the operative provisions of the 1987 Trust Agreement together with amendments in a single instrument, and therefore superceded the 1987 Trust Agreement. The clear and unambiguous language of the 1998 Restatement demonstrated that it was intended to supplant the terms of the 1987 Trust Agreement with amended and restated terms. The 1998 Restatement unambiguously references the "Almon J. Flake Family Trust dated September 22, 1987" as "amend[ed] and restate[d] in full," and therefore reflects the settlor's intent to supplant the 1987 Trust Agreement. *See* Restatement (Second) Trusts § 331, cmt. c (stating that if the settlor reserves a power to modify or revoke the trust without specifying the method of modification, the power can be exercised in any manner which manifests the intent of the settlor to modify). In particular, the 1987 Trust Agreement provisions that provide for the "needs of MARIAN R. FLAKE" and which state that "Marian shall also enjoy Almon's Social Security and all existing retirement funds" were superceded due to their omission from the 1998 Restatement. Mrs. Flake is entitled only to what was provided for in the operative provisions of the 1998 Restatement.

## III. THE 1999 SETTLEMENT AGREEMENT

■ ¶ 23 On April 14, 1999, prior to filing any claims, the parties met to discuss the possibility of a settlement agreement. The 1999 Settlement Agreement confirmed the distribution of the Cadillac to Mrs. Flake, as outlined in the 1998 Restatement. It was also agreed that Mrs. Flake would be the beneficiary of the life estate as outlined in the 1998 Restatement. The trust agreed to pay certain specified debts, and Mrs. Flake agreed to immediately close the accounts giving rise to the debts. Provisions concerning the disposition of additional assets were also outlined in the 1999 Settlement Agreement, including a provision releasing the trust from any other claim that Mrs. Flake may have been able to make under the 1987 Trust Agreement. Since family settlement agreements are "favorites of the law," it is the general policy to encourage these types of agreements. *In re Estate of Grimm*, 784 P.2d 1238, 1243 (Utah Ct.App.1989) ("it is said that the law looks with favor upon an agreement of compromise among members of a family . . . ." (quotations and citations omitted)).

### A. Oral Agreements

■ ¶ 24 Mrs. Flake contends that the 1999 Settlement Agreement, as an oral agreement with testamentary effect, is unenforceable and is subject to section 75-3-912 of the Utah Code, which provides as follows:

> Subject to the rights of creditors and taxing authorities, competent *successors may agree among themselves to alter the interests, shares, or amount to which they are entitled under the will of the decedent, or under the laws of intestacy, in any way that they provide in a written contract executed by all who are affected by its provisions.* The personal representative shall abide by the terms of the agreement, subject to his obligation to administer the estate for the benefit of creditors, to pay taxes and costs of administration, and to carry out the responsibilities of his office for the benefit of any successors of the decedent who are not parties. Personal representatives of decedents' estates are not required to see to the performance of trusts if the trustee thereof is another person who is willing to accept the trust. *Accordingly, trustees of a testamentary trust are successors for the purposes of this section.* Nothing contained in this section relieves trustees of any duties owed to beneficiaries of trusts.

Utah Code Ann. § 75-3-912 (emphasis added). Mrs. Flake argues that the legislative history, official text, and comments, indicate that the Utah Probate Code was designed to establish uniform rules to govern all testamentary documents, including inter vivos trusts, and thus section 75-3-912 should apply to trusts as well as to wills.

¶ 25 When faced with a question of statutory construction, and in attempting to determine legislative intent, this court first looks to the plain language of the statute. *State v. Martinez*, 2002 UT 80, ¶ 12, 52 P.3d 1276; *Stephens v. Bonneville Travel, Inc.*, 935 P.2d 518, 520 (Utah 1997); *Savage Indus. v. Utah State Tax Comm'n*, 811 P.2d 664, 671 (Utah 1991). In construing a statute, we assume that "each term in the statute was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable." *Id.* at 670. "Only if we find some ambiguity [in the statute's plain language] need we look further," *Schurtz v. BMW of N. Am.*, 814 P.2d 1108, 1112 (Utah 1991), and only then "need we seek guidance from the legislative history and relevant policy considerations." *World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253, 259 (Utah 1994).

¶ 26 We turn to the specific language of the statute, which states that "competent successors may agree among themselves to alter the interests, shares, or amount to which they are entitled under the *will* of the decedent, or under the *laws of intestacy*, in any way that they provide in a written contract executed by all who are affected by its provisions." Utah Code Ann. § 75–3–912 (emphasis added). Thus, according to the plain language of the statute of the Utah Probate Code, the requirement of a written contract to alter beneficiary interests applies only to interests created by will or by the laws of intestacy. Mrs. Flake suggests that the statute was poorly drafted and that the drafters intended, but failed, to make the necessary revisions to include agreements affecting interests created by trusts. She may be correct, but there is no evidence thereof in the statute. Its plain terms limit the requirement of a written contract in altering beneficiary interests to a will or the laws of intestacy. We will not look beyond the language to divine legislative intent; the language is clear and unambiguous. *Stephens*, 935 P.2d at 522 (citing *Brinkerhoff v. Forsyth*, 779 P.2d 685, 686 (Utah 1989)). A written agreement is not required to alter interests created by an inter vivos trust.

¶ 27 The issue of whether an oral contract or agreement exists presents questions of both law and fact. "Whether a contract has been formed is ultimately a conclusion of law, but that ordinarily depends on the resolution of subsidiary issues of fact." *Nunley v. Westates Casing Serv., Inc.*, 1999 UT 100, ¶ 17, 989 P.2d 1077, 1083 (citing *O'Hara v. Hall*, 628 P.2d 1289, 1290–91 (Utah 1981)). While we do not defer to the trial court's legal conclusions in reviewing them for correctness, we do defer to its factual findings, and will not set them aside unless they are clearly erroneous. *See Reliance Ins. Co. v. Utah Dep't of Transp.*, 858 P.2d 1363, 1366 (Utah 1993). A trial court's finding of fact is not clearly erroneous unless it is against the clear weight of the evidence or we reach a definite and clear conclusion that a mistake has been made. *See Dep't of Human Serv. v. Irizarry*, 945 P.2d 676, 682 (Utah 1997).

¶ 28 The April 14, 1999 meeting resulted in an enforceable oral agreement that was later memorialized by a writing, the 1999 Settlement Agreement. The terms and conditions of an oral agreement must be sufficiently definite to allow it to be enforced. *See Brown's Shoe Fit Co. v. Olch*, 955 P.2d 357, 363 (Utah Ct.App.1998). In determining whether the parties created an enforceable contract, a court should consider all preliminary negotiations, offers, and counteroffers and interpret the various expressions of the parties for the purpose of deciding whether the parties reached agreement on complete and definite terms. *See* 1 Joseph M. Perillo, *Corbin on Contracts* § 2.1, at 101 (rev. ed.1993). Based on the actions of the parties prior to and after the April 14, 1999 settlement meeting, we conclude that the trial court correctly ruled that the parties entered into an enforceable settlement agreement. The parties were each accompanied by legal representatives at the meeting. The parties agreed to essential terms regarding the life estate, distribution of the Cadillac, payment of outstanding creditors, ownership in the life insurance policies and funeral plan, disposition of the tax proceeds, use and condition of a barn, as well as additional items of personal property. "An agreement cannot be enforced if its terms are indefinite or demon-

strate that there was no intent to contract." *Richard Barton Enters. v. Tsern*, 928 P.2d 368, 373 (Utah 1996) (citing *Valcarce v. Bitters*, 12 Utah 2d 61, 63, 362 P.2d 427, 428 (1961)); *Perillo, supra* § 4.3 at 569. Here, the agreed terms were specific and definite, and the facts found by the trial court demonstrate an intent by the parties to comply with the terms of the 1999 Settlement Agreement.

### B. Waiver

¶ 29 Mrs. Flake contends that the 1999 Settlement Agreement was an unexecuted agreement and as such is unenforceable. As we stated in the foregoing section, the 1999 Settlement Agreement was a valid and enforceable oral settlement agreement. Mrs. Flake further contends that the 1987 Trust Agreement and the 1998 Restatement granted certain rights that could only be relinquished through express waiver. "Waiver is an intentional relinquishment of a known right. 'It must be distinctly made, although it may be express or implied.'" *Interwest Const. v. Palmer*, 886 P.2d 92, 98 (Utah Ct.App.1994) (citing *Webb v. R.O.A. Gen., Inc.*, 773 P.2d 834, 839 (Utah Ct.App. 1989)). With respect to waiver, this court has often used the following formulation:

> A waiver is the intentional relinquishment of a known right. To constitute a waiver, there must be an existing right, benefit, or advantage, a knowledge of its existence, and an intention to relinquish it. [The relinquishment] must be distinctly made, although it may be express or implied.

*Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935 (Utah 1993) (citing *Phoenix Ins. v. Heath*, 90 Utah 187, 194, 61 P.2d 308, 311–12 (1936)).

¶ 30 Thus, we have previously stated that a "[w]aiver is an intentional relinquishment of a known right." *Interwest*, 886 P.2d at 98. To constitute a waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it. Mrs. Flake argues that the waiver " 'must be distinctly made, although it may be express or implied.'" *Hunter v. Hunter*, 669 P.2d 430, 432 (Utah 1983) (quoting *Am. Sav. Loan Ass'n v. Blomquist*, 21 Utah 2d 289, 292, 445 P.2d 1, 3

(1968)). While it is true that a waiver, or the relinquishment of a known right, must be distinctly made, it still may be express or implied. Mrs. Flake relies on language in *Hunter*, 669 P.2d at 432, which sought to elaborate restrictively on what specific facts might be necessary to support a finding of intent. *Hunter* stated that "[t]o constitute waiver, one's actions or conduct must be distinctly made, must evince in some unequivocal manner an intent to waive, and must be inconsistent with any other intent." *Id.* The language in *Hunter*, stating the need for an unequivocal intent to waive a known right, was later addressed by this court. In *Soter's*, 857 P.2d at 942, this court reiterated that the legal standard of *Phoenix* is the correct standard required to establish waiver. "A waiver is the intentional relinquishment of a known right. To constitute waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it." *Soter's*, 857 P.2d at 942 (citing *Phoenix*, 61 P.2d at 311–12). *Soter's* further clarified that the intent to relinquish a right must be distinct, and this determination is made by looking at the totality of the circumstances. *Soter's*, 857 P.2d at 942. The court noted that in Utah, a distinct intent to waive may only be shown by a preponderance of the evidence. *Id.* at 942, n. 6.

¶ 31 "Waiver of a contractual right occurs when a party to a contract intentionally acts in a manner inconsistent with its contractual rights, and, as a result, prejudice accrues to the opposing party or parties to the contract." *Interwest Const.*, 886 P.2d at 98; *see also Cooper v. Foresters Underwriters, Inc.*, 2 Utah 2d 373, 376–77, 275 P.2d 675, 677 (1954) (holding defendant did not waive the right to enforce a contract because defendant's actions were not inconsistent with terms of contract nor did defendant induce belief that it did not intend to enforce terms of contract). Here, the evidence shows that the actions of Mrs. Flake were intended to relinquish known rights. She agreed to assign ownership to the trust of the life insurance policy as well as the funeral plan, and acted accordingly. She agreed to close the outstanding credit accounts in com-

pliance with the Trust's agreement to pay those outstanding debts, and again acted accordingly. Mrs. Flake agreed to and received the distribution of the Cadillac. She agreed to the terms of the life estate as outlined in the 1998 Restatement. When looking to the totality of the circumstances, Mrs. Flake's actions were consistent with the terms of the 1999 Settlement Agreement, and thus her actions satisfy the elements of waiver.

## IV. LIS PENDENS

¶ 32 The trustee argues on cross-appeal that the trial court erred in failing to award fees and costs resulting from Mrs. Flake's failure to remove a lis pendens from certain trust property. Under Utah Code Ann. sections 38–9–4 and 38–12–102, 103, appellee argues that Mrs. Flake filed a lien and failed to provide notice within thirty days after recordation as required under Utah Code Ann. § 38–12–102. Appellee argues that this subjects Mrs. Flake to liability of "$1,000 or for treble actual damages," whichever is greater, and for reasonable attorney fees and costs. Utah Code Ann. section 38–12–103(a) states that "[a] person who fails to meet the notice requirements" is "precluded from receiving an award of costs and attorney's fees from the person against whom a notice of lien has been filed." However, Utah Code Ann. section 38–12–103(b) provides that "[s]ubsection (1)(a)," a person's failure to meet the notice requirements, "does not create a right to costs and attorneys' fees."

¶ 33 Mrs. Flake argued that the lis pendens was recorded to give constructive notice that the property was the subject of litigation. The trial court found that based on Mrs. Flake's withdrawal of her claims of undue influence all lis pendens filed on property in this case should be released. The trial court considered the trustee's argument and declined to award the statutory penalty for failing to give notice. Utah Code Ann. section 38–12–103(2) provides for penalties to the lien claimant for noncompliance with the

notice requirements or for *a willful refusal to release the lien*. After the trial court's finding that all lis pendens should be released, Mrs. Flake filed a Motion for Stay Pending Appeal and Further Order of the Court. The trial court issued its final Order Dissolving Lis Pendens on July 11, 2001. During the pendency of the litigation, the lis pendens did not create any actual damages to the litigants. The lis pendens did not cloud title because, other than an attempt to refinance, there was no attempt to transfer or convey the underlying property. Our review of the record does not indicate that the trial court's finding was clearly erroneous. We agree with the trial court that there was no willful refusal to release the notice of lien, and therefore that Mrs. Flake should not have been ordered to pay damages.

## CONCLUSION

¶ 34 For the foregoing reasons, we affirm the trial court's ruling granting the motion to dismiss, but reverse as to the enforceability of the original 1987 Trust Agreement. We find that the 1998 Restatement and the 1999 Settlement Agreement govern the disposition of the estate of Almon J. Flake. Accordingly, Mrs. Flake is entitled to the following distributions: (i) the life estate as outlined in the 1998 Restatement; (ii) the distribution of the Cadillac; (iii) the payment of the commercial debts as outlined in the 1999 Settlement Agreement; (iv) the right to the funeral plan maintained by the trust; and (v) the right to the upper level of the barn as a storage facility. Mrs. Flake is not entitled to monthly support from the trust, nor is she entitled to receive the decedent's social security, according to the 1998 Restatement,[4] and retirement funds as outlined in the 1987 Trust Agreement.

¶ 35 The trustee contends that the trust is entitled to repayment of the support payments paid through the time of trial and post-trial. In light of our decision, this case is remanded for a determination of the amount of payments, if any, that Mrs. Flake must repay to the trust. *See Capital Transit*

---

4. We are at a loss to understand this particular provision, inasmuch as social security benefits are determined by the Social Security Administration and are not subject to allocation by trust documents.

Co. v. Pub. Util. Comm'n, 93 U.S.App.D.C. 194, 214, 213 F.2d 176, 195, (D.C.Cir.1954) (citing *Cox v. Dixie Power Co.*, 81 Utah 94, 16 P.2d 916 (Utah 1932)). "The trial court has power to order restitution in an independent suit, or upon a motion filed in the original proceeding[,]" *id.* (citation omitted), and we believe that the trial court should undertake the disposition of the trustee's claims here, as was observed in *Capital Transit Co.,*

> The disposition of a claim for restitution may well involve issues of fact and law, conflicting equities, and problems of legal and administrative policy. These can best be dealt with and disposed of initially by the [trial court]. . . .

213 F.2d 176 at 196. We agree also with the comment that,

> "In view of the ruling of the Supreme Court in *Atlantic Coast Line R. Co. v. Florida* [295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451 (1935)] that restitution upon the reversal of a judgment 'is not of mere right. It is ex gratia, resting in the exercise of a sound discretion. . . .' "

*Id.* at 196 (citations omitted). Thus, it is appropriate for the trial court to consider this claim in the first instance.

¶ 36 Associate Chief Justice DURRANT, Justice RUSSON, Justice WILKINS, and Judge GREENWOOD concur in Chief Justice DURHAM's opinion.

¶ 37 Having recused himself, Justice HOWE does not participate herein; Court of Appeals Judge PAMELA T. GREENWOOD sat.