2011 UT 35

**MEADOW VALLEY CONTRACTORS, INC., Plaintiff, Appellee and Cross–Appellant,**

v.

**STATE of Utah DEPARTMENT OF TRANSPORTATION, Defendant, Appellant and Cross–Appellee.**

No. 20090025.

Supreme Court of Utah.

July 12, 2011.

Rehearing Denied Sept. 19, 2011.

Kent B. Scott, Justin E. Scott, Cody W. Wilson, Salt Lake City, for plaintiff.

Mark L. Shurtleff, Att'y Gen., Randy S. Hunter, Asst. Att'y Gen., Dan R. Larsen, Troy L. Booher, Salt Lake City, for defendant.

Justice NEHRING, opinion of the Court:

## INTRODUCTION

¶ 1 This appeal comes to us following a bench trial in a breach of contract action. The trial court concluded that the Utah Department of Transportation (UDOT) breached its contract with Meadow Valley Contractors (MVC) when UDOT's project engineer told MVC and its subcontractor, Southwest Asphalt Paving (Southwest), that they could not use "ribbon paving" on portions of an Interstate 215 freeway construction project (the I–215 Project). The trial court reasoned that the contract permitted ribbon paving, that MVC suffered damages from not being able to use ribbon paving, and that UDOT had actual notice that the damages would accrue. UDOT appeals this decision. Because we conclude that the contract allowed UDOT to significantly alter the I–215 Project, we hold that UDOT did not breach its contract with MVC. And because MVC did not give UDOT timely written notice of the alleged ribbon-paving change as required by the contract, we hold that MVC waived any right to additional compensation arising from the ribbon-paving change. We therefore reverse the decision of the trial court.

¶ 2 The trial court also denied MVC's claim that UDOT had erroneously imposed a paving-thickness penalty. MVC cross-appeals this decision. Because there is sufficient evidence to support the trial court's conclusion that UDOT's interpretation of the contract was more reasonable than MVC's interpretation, we affirm the trial court's decision.

## BACKGROUND

¶ 3 UDOT contracted with MVC to serve as the general contractor for a highway construction project on I–215. MVC subcontracted the paving work to Southwest. Southwest bid the job based on its belief that the general contract permitted "ribbon paving," the most cost-effective and widely used method of paving.

¶ 4 At a pre-pave meeting in June 2003, UDOT's project engineer, Brandon Squire, informed MVC and Southwest that ribbon paving would not be permitted in areas where it would result in a greater-than-two-inch vertical grade separation between traffic lanes because the contract's paving specifications did not allow traffic to traverse a vertical grade separation greater than two inches. In response, Southwest's project manager, David Olson, informed Mr. Squire that Southwest could mitigate the greater-than-two-inch vertical grade separation by using a 5:1 or flatter taper on the vertical edges between traffic lanes, a practice that Southwest had successfully performed on other projects and that Mr. Olson claimed was permitted by the contract. Mr. Squire rejected this suggestion, believing that Southwest would be unable to achieve adequate compaction with anything flatter than a 3:1 slope. Mr. Olson then verbally informed Mr. Squire that a ban on ribbon paving would result in increased costs, production inefficiencies, and scheduling problems. Presented with this information, Mr. Squire reiterated his position that the contract did not allow ribbon paving where it would result in a greater-than-two-inch vertical grade separation.

¶ 5 The general contract contained provisions designed to resolve such "alleged changes to the [c]ontract." Under Section 1.7 of the contract, MVC was instructed to "*not perform further work* or incur further contract item expense[s] relating to the claimed change." MVC was also required to notify Mr. Squire of the "alleged changes to the [c]ontract ... *in writing within 5 calendar days* of the date the change or action was noted." Section 1.7 stated that "*[t]he failure to provide required notice ... constitutes a waiver of any and all claims* that

may arise as a result of the alleged change." Despite these clearly worded contractual provisions, neither MVC nor Southwest stopped working or gave Mr. Squire written notice of the alleged ribbon-paving change.

¶ 6 Approximately three weeks later, at another pre-pave meeting, the ribbon-paving issue reared its head again. This time, Ken Schmidt, Southwest's project superintendent, verbally informed Mr. Squire that not permitting ribbon paving would negatively affect Southwest's production output and scheduling. Mr. Squire simply reiterated his position that ribbon paving was not allowed where it would result in a greater-than-two-inch vertical grade separation. Again, neither MVC nor Southwest provided UDOT with written notice of the "alleged change" as required by the contract.

¶ 7 Over the next two months, various Southwest representatives verbally informed Mr. Squire and other UDOT personnel that not being allowed to use ribbon paving was adversely affecting Southwest's work. As before, Mr. Squire simply responded that the contract did not permit ribbon paving and directed Southwest to continue paving using another method. Having been expressly forbidden to utilize ribbon paving, Southwest turned to a more expensive method of paving known as "block paving" on a significant portion of the I–215 Project.[1]

¶ 8 The contract also contained provisions that governed the thickness of the pavement. The contract required UDOT to accept the thickness of the pavement if "[t]he average thickness of all sublots is not more than 1/2 inch greater nor 1/4 inch less than the total thickness specified" and "[n]o individual sublot shows a deficient thickness of more than 3/8 inch." The parties agreed that the pavement would be five inches thick and would be laid in two lifts, or applications, on two days: the first lift was to be three inches thick, and the second lift, two inches thick. After most of the paving was complete, UDOT informed MVC and Southwest that several areas had a deviation of more than 3/8 inches as to the

total five inches of pavement laid and assessed MVC a $166,416 thickness penalty. MVC contested the penalty; it argued that the contract permitted a 3/8–inch thickness deficiency on *each* of the two layers laid, not just the total five inches of pavement. UDOT refused to withdraw the paving-thickness penalty.

¶ 9 These two conflicts led MVC to file a formal claim against UDOT. MVC alleged that (1) it incurred costs not contemplated by the contract as a result of UDOT's prohibition on ribbon paving and (2) the thickness penalty assessed by UDOT was unwarranted. The UDOT Claims Board of Review[2] unanimously recommended that MVC's claims be denied. As recommended, UDOT's deputy director denied MVC's claims.

¶ 10 When UDOT denied MVC's claims, MVC passed the losses along to Southwest because its subcontract only obligated MVC to give Southwest payments that MVC received from UDOT. Southwest, however, could not sue UDOT directly because Southwest did not have privity of contract with UDOT. So rather than having Southwest sue MVC, and then MVC sue UDOT, Southwest and MVC entered into a "Claims Prosecution and Tolling Agreement" whereby MVC assigned and granted to Southwest the right to prosecute MVC's claims against UDOT in MVC's name. In exchange for the assignment, Southwest agreed that MVC would not be liable to Southwest on any of the paving claims.

¶ 11 Southwest then filed a complaint in district court in MVC's name that alleged UDOT breached its contract with MVC when UDOT (1) prohibited ribbon paving and (2) assessed the $166,416 pavement-thickness penalty. A bench trial ensued. As to the ribbon-paving claim, the trial court held that UDOT breached its contract with MVC when UDOT directed MVC and Southwest to not use ribbon paving on the I–215 Project. The court reasoned that the contract allowed ribbon paving on the entire I–215 Project and

---

1. Block paving is more costly than ribbon paving due to lost production time associated with multiple start-ups and shut-downs of the asphalt plant.

2. The Board of Review is a three-person panel comprised of one general contractor and two UDOT employees.

that Mr. Squire's misinterpretation of the contract "interfered with the methods and means by which the asphalt paving should have been allowed." In the alternative, the trial court ruled that even though MVC did not strictly comply with the contract's notice provisions, it was nonetheless entitled to additional compensation because (1) UDOT had actual notice that a ban on ribbon paving would result in additional costs and other problems, (2) UDOT and MVC orally modified the contract's notice provisions, and (3) UDOT waived and was estopped from asserting that MVC and Southwest must strictly comply with the contract's notification provisions. Accordingly, the trial court awarded MVC $548,832.52 in damages and $225,247.06 in prejudgment interest. UDOT appeals this ruling.

¶ 12 In addition, the trial court denied MVC's paving-thickness claim. The trial court held that UDOT's position that the 3/8-inch deviation applied to the total five inches of pavement, rather than each individual layer of pavement, was "the more reasonable interpretation as otherwise the potential total deviation in thickness could be multiplied by the number of layers or lifts that could result in a substantial deviation from the contract requirements." MVC cross-appeals this ruling. We have jurisdiction under Utah Code section 78A–3–102(3)(j) (Supp.2010).

## STANDARD OF REVIEW

¶ 13 "The interpretation of a contract is a question of law, which we review for correctness, giving no deference to the ruling of the district court."[3] "[W]hether the [district] court employed the proper standard of [contractual] waiver presents a legal question which is reviewed for correctness, but the actions or events allegedly supporting waiver are factual in nature and should be reviewed as factual determinations, to

which we give a district court deference."[4] Similarly, "equitable estoppel is a mixed question of fact and law. Consequently, we review questions of fact under a deferential clear error standard, but grant no deference to questions of law."[5]

## ANALYSIS

¶ 14 On appeal, UDOT urges this court to hold that the trial court erred when it awarded MVC damages related to block paving the I–215 Project. UDOT makes three arguments in support of its contention. First, UDOT argues that Southwest cannot recover the damages it suffered under MVC's assignment of claims because under Utah law, an assignee (Southwest) may only recover damages suffered by its assignor (MVC). Because UDOT did not preserve this argument, we do not reach its merits. Second, UDOT contends that the trial court erred in holding that UDOT breached the contract when Mr. Squire directed that MVC and Southwest not use ribbon paving. Specifically, UDOT contends that the trial court erred because MVC waived any right to additional compensation arising from the ribbon-paving directive when MVC failed to give UDOT written notice of the alleged change within five days as required by the contract. Finally, UDOT contends that the trial court erred when it held in a number of alternative rulings that UDOT modified, waived, and was estopped from strictly enforcing the contract's written notice provisions against MVC. We agree with UDOT and reverse the decision of the trial court.

¶ 15 On cross-appeal, MVC urges us to conclude that the trial court erred when it held that MVC was not entitled to recover the asphalt-thickness penalty.[6] Although we conclude that the contract is ambiguous, we hold that there is sufficient evidence in the

---

**3.** *Salt Lake City Corp. v. Big Ditch Irrigation Co.,* 2011 UT 33, ¶ 19, 258 P.3d 539.

**4.** *Cedar Surgery Ctr., L.L.C. v. Bonelli,* 2004 UT 58, ¶ 6, 96 P.3d 911 (first and second alterations in original) (quoting *Pledger v. Gillespie,* 1999 UT 54, ¶ 16, 982 P.2d 572).

**5.** *Anderson v. Thompson,* 2008 UT App 3, ¶ 13, 176 P.3d 464 (internal quotation marks omitted).

**6.** MVC also contends that the trial court erred when it held that prejudgment interest on MVC's damages began to accrue on November 1, 2004. Because we ultimately hold that MVC is not entitled to any damages arising from the ribbon-paving change, we need not address this claim.

record to support the trial court's conclusion that UDOT's interpretation of the contract more accurately reflects the intentions of the parties to the contract. We therefore affirm the decision of the trial court on this matter.

## I. UDOT DID NOT PRESERVE THE ARGUMENT THAT AN ASSIGNEE CAN ONLY RECOVER DAMAGES SUFFERED BY ITS ASSIGNOR AND WE DECLINE TO REACH ITS MERITS UNDER THE PLAIN ERROR DOCTRINE

¶ 16 UDOT contends, for the first time on appeal, that the trial court erred when it awarded MVC $768,365 in damages that were actually suffered by Southwest. UDOT argues that Southwest brought the lawsuit under an assignment of MVC's claims against UDOT, but that under Utah law an assignee cannot sue under the assignor's breach of contract claim to recover damages suffered by the assignee. Although UDOT concedes it did not preserve the issue below, it argues "the error is plain and warrants reversal." We disagree.

¶ 17 It is well established that "a [party] who fails to bring an issue before the trial court is barred from asserting it on appeal."[7] We have recognized two exceptions to this general rule: plain error and exceptional circumstances.[8] The party seeking the benefit of the plain error exception "must demonstrate that (i) an error exists; (ii) the error should have been obvious to the

trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome."[9]

¶ 18 In this case, it is not clear that an error exists. UDOT argues that the trial court erred because this court held in *SME Industries, Inc. v. Thompson, Ventulett, Stainback & Associates, Inc.* that an assignee "may not recover the damages *it* suffered as a result of [an] alleged breach of [contract]. Rather, [the assignee's] recovery, if any, is limited to those damages [the assignor] suffered as a result of [the] alleged breach."[10] Or, stated another way, "an assignee can acquire no right superior to those held by the assignor, and 'simply stands in the shoes of the assignor.'"[11] Applied here, UDOT claims that MVC (the assignor) did not incur any damages because it passed all the losses along to Southwest (the assignee) and was only obligated to pay Southwest if it first received compensation from UDOT.

¶ 19 We disagree that an error clearly exists. Contrary to UDOT's assertion, we have never squarely addressed the issue presented here: whether an assignee can assert a breach of contract claim in the name of its assignor when the assignee agrees not to sue the assignor in exchange for the assignor's right to sue the obligor. *SME Industries* does not squarely address this issue, and we have not found any other relevant case law that clearly suggests there was an error.[12]

---

7. *State v. Pecht*, 2002 UT 41, ¶ 18, 48 P.3d 931.

8. *State v. Dean*, 2004 UT 63, ¶ 13, 95 P.3d 276.

9. *State v. Ross*, 2007 UT 89, ¶ 17, 174 P.3d 628 (internal quotation marks omitted).

10. 2001 UT 54, ¶ 30, 28 P.3d 669.

11. *Id.* (quoting 6 Am. Jur.2d *Assignments* § 144 (1999)).

12. The concurrence correctly points out that under *SME Industries* an assignee "is limited to those damages the [assignor] suffered as a result of [the] alleged breach." *Id.* ¶ 30. However, in *SME Industries*, we did not examine the scope of the damages suffered by the assignor, nor the extent to which those damages may include exposure to third-party liability as a result of the alleged breach.

Here, MVC and Southwest entered a settlement agreement in which MVC assigned its claims against UDOT in an attempt to limit liability. The fact that Southwest has agreed not to pursue any possible claims against MVC does not preclude finding that MVC was damaged by UDOT for the amount of liability to which MVC was exposed. That determination may depend on the specific details and reservation of rights within the settlement agreement. It may well be that Utah law allows an assignee to establish that it could recover from the assignor and that its recovery would be considered part of the assignor's damages under the assigned claims. While we do not so hold here, we do not think that the law is so settled on this point that it is clear and obvious, and we decline to find that the trial court plainly erred when the argument was never raised below.

¶ 20 Furthermore, even assuming an error did exist, we disagree with UDOT's contention that the error "should have been obvious to the trial court." Although the trial court did distinguish between Southwest and MVC and understood that MVC "did not have a dog in this fight" because all of MVC's damages were passed on to Southwest under the subcontract, UDOT did not make its assignment argument to the trial court. We conclude that the trial court's limited factual knowledge about the parties' interests was not sufficient to apprise it of any alleged error, particularly where the issue had not been squarely addressed by any Utah court. Thus, we decline to reach MVC's argument under the plain error doctrine.

## II. UDOT DID NOT BREACH ITS CONTRACT WITH MVC, AND MVC WAIVED ANY RIGHT TO ADDITIONAL COMPENSATION BECAUSE IT DID NOT GIVE UDOT WRITTEN NOTICE WITHIN FIVE DAYS OF THE ALLEGED RIBBON-PAVING CHANGE

¶ 21 Next, we consider whether the trial court erred in holding that UDOT breached its contract with MVC when Mr. Squire told MVC and Southwest that they could not use ribbon paving on portions of the I–215 Project. The trial court reasoned that the I–215 Project specifications permitted ribbon paving on the entire I–215 Project and therefore concluded that Mr. Squire's ban on ribbon paving "interfered with the method and means by which the asphalt paving should have been allowed to be performed by [MVC and Southwest]."

¶ 22 UDOT contends that the trial court erred because, even if the contract allowed ribbon paving, the contract also allowed Mr. Squire to make significant changes to the I–215 Project. UDOT also argues that MVC waived any claims for additional compensation because it did not give UDOT written notice of the alleged ribbon-paving change within five days as required by Section 1.7 of the contract. We address each argument below.[13]

### A. UDOT Did Not Breach Its Contract With MVC When Mr. Squire Directed MVC and Southwest Not to Use Ribbon Paving on Portions of the I–215 Project

¶ 23 We first address whether the trial court erred in holding that UDOT breached its contract with MVC when Mr. Squire directed MVC and Southwest to not use ribbon paving on portions of the I–215 Project. UDOT contends that the trial court erred because even if the contract allowed ribbon paving, the ribbon-paving ban was not a breach of the contract because the contract also permitted Mr. Squire to significantly alter the I–215 Project.

¶ 24 Because the interpretation of the terms of a contract is a question of law, "[w]e review a district court's interpretation of a contract for correctness, giving no deference to the district court."[14] When interpreting a contract, "we examine the [plain] language of a contract to determine meaning and intent."[15] Section 1.5 of the contract states, "The [e]ngineer reserves the right at any

---

13. MVC contends that these issues were not preserved below. As we just explained, "a [party] who fails to bring an issue before the trial court is barred from asserting it on appeal." *State v. Pecht*, 2002 UT 41, ¶ 18, 48 P.3d 931. MVC asserts that UDOT never argued that it had the right to alter the contract. Instead, MVC argues that "UDOT's only position at trial was that it correctly interpreted the I–215 Project Specifications when it directed MVC [and] Southwest to not ribbon pave in [certain] areas." We disagree. UDOT argued in its trial brief that "MVC waived any claims [against UDOT] because MVC did not comply with the notice and dispute resolution requirements of the prime contract." And the trial court considered at length whether MVC's and Southwest's responses to Mr. Squire's ban on ribbon paving complied with the contract's notice requirements. Therefore, UDOT has preserved these issues for appeal.

14. *Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 16, 215 P.3d 933.

15. *Glenn v. Reese*, 2009 UT 80, ¶ 10, 225 P.3d 185. We note that neither party has deemed it necessary to provide us with the entire contract. Instead, UDOT provides what it argues are the relevant portions of the contract. Because MVC does not suggest that we need to consider other portions of the contract to resolve this dispute, our review is limited to the contractual provisions provided.

time during the work *to make written changes in quantities and alterations in the work* that are necessary to satisfactorily complete the project." Section 1.5 also provides that "[s]uch changes in quantities and alterations *do not invalidate the [c]ontract or release the surety,* and the [c]ontractor agrees to perform the work as altered." Furthermore, Section 1.7 outlines the notification procedures for "Differing Site Conditions, *Changes and Extra Work*" and provides that MVC must "[p]romptly notify the [e]ngineer of *alleged changes to the [c]ontract* due to differing site conditions, *extra work, altered work beyond the scope of the [c]ontract, or actions taken by [UDOT] that change the [c]ontract terms and conditions.*"

¶ 25 These provisions plainly demonstrate that the contract permitted UDOT to alter the scope of the work for the I–215 Project. But UDOT's authority to change the scope of work did not mean that it could unilaterally compel MVC to perform uncompensated work. Rather, the contract conditioned MVC's right to payment for additional work on performance of the modest notice requirements found in Section 1.7 of the contract. Accordingly, we hold that Mr. Squire's ban on ribbon paving the I–215 Project did not breach the contract.

B. *MVC Waived Any Claims for Additional Compensation Arising From Block Paving Because It Did Not Comply With the Contract's Notice Procedures*

¶ 26 The next issue is whether MVC is entitled to compensation for the extra costs of having to block pave the I–215 Project. MVC contends that it is entitled to additional compensation because Section 1.5 of the contract requires UDOT to make all changes in writing and requires UDOT to pay for any extra costs arising from the change. In contrast, UDOT contends that the ribbon-paving ban was an "alleged change" governed by Section 1.7 of the contract. UDOT argues that under Section 1.7, MVC was required to give UDOT written notice of any "alleged changes" to the contract and, by failing to do so, MVC waived any claims for compensation arising from the alleged ribbon-paving change.

¶ 27 To resolve this dispute, we again look to the text of the contract. When possible, we derive the parties' intent from the plain meaning of the contractual language and consider each contractual provision in relation to the other provisions with an eye toward giving effect to all provisions and ignoring none.[16]

¶ 28 Section 1.5 is titled "Significant Changes in the Character of Work." It states that "[t]he [e]ngineer reserves the right at any time during the work to make *written changes* in quantities and alterations in the work that are necessary to satisfactorily complete the project." Section 1.5 further provides that "[s]uch changes in quantities and alterations do not invalidate the [c]ontract or release the surety, and the [c]ontractor agrees to perform the work as altered." Finally, Section 1.5 states that *"[UDOT] adjusts the [c]ontract . . . if the alterations or changes in quantities significantly change the character of the work under the [c]ontract."*

¶ 29 Section 1.7 is titled "Notification of Differing Site Conditions, Changes and Extra Work." It states that MVC must "[p]romptly notify the [e]ngineer of *alleged changes* to the [c]ontract due to differing site conditions, extra work, altered work beyond the scope of the [c]ontract, or actions taken by [UDOT] that change the [c]ontract terms and conditions." Section 1.7 requires MVC to "[i]mmediately notify the [e]ngineer verbally of the alleged change or extra work" and provide certain information "to the [e]ngineer *in writing* within 5 calendar days of the date the change or action was noted." Section 1.7 also instructs MVC to "not perform further work or incur further contract item expense relating to the claimed change after the date the change allegedly occurred, unless directed otherwise in writing by the [e]ngineer." Most importantly, Section 1.7 warns that *"[t]he failure to provide required notice* under this article *constitutes a waiver of any and all claims that may arise as a result of the alleged change."* [17]

16. *Id.* ¶ 10.

17. Dispute and claim resolution procedures are also addressed in Sections 1.20 and 1.21 of the

¶ 30 MVC contends that it is entitled to additional compensation under Section 1.5 of the contract. MVC asserts that UDOT breached Section 1.5 because Mr. Squire did not put the ribbon-paving ban in writing. MVC also argues that even if UDOT had made "written changes in quantities and alterations in work" as required by Section 1.5, that section also required UDOT to *"adjust[ ] the [c]ontract . . .* if the alterations or changes in quality significantly change the character of the work under the [c]ontract."

¶ 31 UDOT contends that the ribbon-paving ban was an "alleged change" that falls under Section 1.7 of the contract. UDOT argues that the contract contemplates two types of changes: Section 1.5 governs changes the engineer "knowingly and deliberately" makes to the project, while Section 1.7 governs "alleged changes," or work directives that the engineer believes are consistent with the contract but MVC believes are inconsistent. UDOT asserts that the ribbon-paving directive was an "alleged change" because Mr. Squire consistently maintained that the contract did not allow ribbon paving. UDOT also notes that Section 1.7 clearly states that "[t]he failure to provide required notice [under Section 1.7] constitutes a waiver of any and all claims that may arise as a result of the alleged change." Thus, UDOT argues that MVC waived any claims for additional compensation because it did not notify UDOT in writing that the ribbon-paving ban altered the I–215 Project beyond the scope of the contract and would require extra compensation.

¶ 32 It is not lost on us that the incorporation of a mental state is an unusual feature of a construction contract. Nevertheless, we agree that Section 1.5 governs "knowing and deliberate" changes to the I–215 Project and that Section 1.7 governs "alleged changes." To determine whether the ribbon-paving ban was a "knowing and deliberate" change or an "alleged change" turns on whether Mr.

Squire believed that the ban altered the contract. For a work directive cannot be, by definition, an "alleged change" unless the parties disagree as to whether the directive is permitted by the contract. Otherwise, the directive would simply be an "accepted or agreed upon change."

■ ¶ 33 Here, Mr. Squire consistently maintained that the contract did not permit ribbon paving, while Southwest and MVC argued that the contract allowed ribbon paving. Thus, Mr. Squire's ribbon-paving ban was an "alleged change" governed by Section 1.7 of the contract. And Section 1.7 clearly instructed MVC to "not perform further work" and to give Mr. Squire written notice of the alleged change "in writing within 5 calendar days of the date the change or action was noted." Because MVC neither stopped working nor gave UDOT written notice of the alleged ribbon-paving change, the contract requires us to hold that MVC waived "any and all claims that may arise as a result of the alleged [ribbon-paving] change."

## III. MVC WAS NOT EXCUSED FROM COMPLYING WITH THE CONTRACT'S NOTICE PROVISIONS

¶ 34 Although MVC failed to comply with Section 1.7's notice provisions, we must still determine whether MVC's failure was excused due to UDOT's course of conduct. In a number of alternative rulings, the trial court concluded that MVC was not required to comply with the contract's notice procedures because UDOT (1) had actual notice that block paving would result in increased costs, (2) modified the contract through its course of conduct, and (3) waived and was estopped from demanding that MVC comply with the contract's notice provisions. We address each alternative ruling in turn.

contract. Section 1.20 instructs MVC to "[n]otify [UDOT] verbally and in writing of the dispute [as provided in Section 1.7] before beginning or continuing the affected work, if additional compensation is considered due for work or material not covered in the contract." Section 1.20 also warns that "[UDOT] does not grant additional compensation if verbal and or written notifica-

tion is not given, or if the [e]ngineer is not given proper facilities for keeping strict account of actual costs." Likewise, Section 1.21 states that MVC must "[p]rovide written notification of the intent to make a claim under [Section 1.7]" and "[s]ubmit the formal claim in writing and with sufficient detail to enable the [e]ngineer to ascertain the basis and amount of the claim."

## A. UDOT Was Entitled to Enforce the Contract's Written Notice Provisions Even Though It Had Actual Notice That Block Paving Would Result in Increased Costs

¶ 35 First, the trial court held that UDOT could not enforce the contract's written notice requirement because "UDOT had actual verbal notice of the impacts suffered by [MVC and Southwest]" and "UDOT was not prejudiced by any lack of formal written notice." The trial court reasoned that under this court's decision in *Thorn Construction Co. v. Utah Department of Transportation*,[18] if a project engineer orally furnishes a directive during construction for extra work not contemplated by the contractor's original bid and the project engineer is given actual notice that the extra work will require additional compensation, then "formal notice under the terms of the contract is not required because the project engineer is obviously on notice that extra compensation will be required." The trial court misconstrued our holding in *Thorn*.

¶ 36 In *Thorn*, UDOT contracted with Thorn Construction to construct an access road.[19] Later, UDOT's project engineer orally directed Thorn Construction to widen a portion of the road and agreed to pay for the extra expenses.[20] After the road was constructed, UDOT refused to pay for the extra expenses on the basis that Thorn Construction failed to provide a written request for additional compensation as required by the contract.[21] The contract provided,

[W]here the contractor deems that additional compensation is due him for work or material not clearly covered in the contract *or not ordered by the engineer as extra work* ... the contractor shall notify the engineer in writing of his intention to make a claim for such additional compen-

sation before he begins the work on which he bases the claim.[22]

¶ 37 Based on the plain language of the contract, we concluded that Thorn Construction was not required to make a written request for additional compensation. We reasoned that *the contract itself* did "not contemplate the necessity of a written order ... where the project engineer ... causes extra work to be performed."[23] Because "the extra work was specifically ordered by the engineer," we concluded that "[UDOT] obviously [was] on notice that additional compensation [would] be required."[24] MVC argues that under *Thorn*, "if a party entitled to receive notice of a change was already aware, or should have been aware, of the change, then there is no need to comply with strict written notice provisions of a contract." MVC asserts that it was not required to comply with the contract's notice provisions because UDOT had actual notice that block paving would impose extra costs. MVC reads *Thorn* too broadly.

¶ 38 Our decision in *Thorn* was based on the language of the contract itself, not the fact that UDOT had actual notice of the claim for extra compensation. The contract in that case required Thorn Construction to notify the engineer in writing of any claims for additional compensation arising from work "not ordered by the engineer as extra work."[25] Because the engineer had "specifically ordered" the "extra work" and agreed to pay for the extra expenses, *meaning the engineer knew that the work was not required by the contract*, we held that the contract did not require Thorn Construction to give written notice of its claim for additional compensation.[26]

¶ 39 Here, unlike the engineer in *Thorn*, Mr. Squire consistently maintained that the contract did not allow ribbon paving. And Mr. Squire never agreed to reimburse MVC

18. 598 P.2d 365 (Utah 1979).

19. *See id.* at 366.

20. *See id.* at 367.

21. *See id.*

22. *Id.* at 369 (emphasis added).

23. *Id.* at 370.

24. *Id.*

25. *Id.* at 369.

26. *Id.* at 370.

for any extra expenses arising from block paving. As we explained above, if Mr. Squire had agreed that the contract permitted ribbon paving, then his ribbon-paving ban would have been a "knowing and deliberate" change governed by Section 1.5. Under those circumstances, UDOT would have been required to give MVC written notice of the change and, as in *Thorn,* MVC would not have been required to give UDOT written notice of the "alleged change" precisely because Mr. Squire's written order would have put UDOT on notice that additional compensation would be required. But because Mr. Squire consistently told MVC and Southwest that the contract *did not permit* ribbon paving, the ribbon-paving directive was an "alleged change" subject to Section 1.7 of the contract. And unlike the contract in *Thorn,* Section 1.7 explicitly provides that "[t]he failure to provide required notice under [Section 1.7] constitutes a waiver of any and all claims that may arise as a result of the alleged change." Thus, under the plain language of Section 1.7, MVC was contractually obligated to notify UDOT in writing of the alleged ribbon-paving change. Because MVC did not comply with these clearly stated notice procedures, MVC waived any claims that arose from the alleged ribbon-paving change.

## B. UDOT Did Not Orally Modify the Contract's Notice Provisions

¶ 40 Next, the trial court held that UDOT and MVC orally modified the contract's notice provisions when Mr. Squire directed MVC and Southwest to not use ribbon paving on the I–215 Project after being "made aware verbally by [MVC and Southwest] that block paving would significantly and adversely impact [MVC and Southwest's] costs, production, and efficiency." We disagree.

¶ 41 In Utah, parties to a written agreement may modify that written agreement through subsequent verbal negotiations.[27] Here, UDOT and MVC never discussed—much less verbally negotiated—the contract's notice procedures. Nor did UDOT

tell MVC or Southwest that their verbal complaints satisfied the contract's notice procedures or otherwise imply that MVC was not required to provide written notice of the alleged ribbon-paving change. Furthermore, MVC's project engineer testified that MVC understood that it had to comply with the notice procedures. Accordingly, we conclude that UDOT did not modify the contract's notice procedures.

¶ 42 MVC argues, however, that UDOT modified the notice provisions when it directed MVC and Southwest to use block paving without demanding that MVC and Southwest give UDOT written notice of the change. MVC reasons that if UDOT did not intend to modify the notice requirements, it would have requested that MVC and Southwest comply with the contract's notice requirements. We disagree.

¶ 43 Contractual obligations are not modified through mere silence or by not demanding that another party comply with its existing contractual obligations. Section 1.7 of the contract clearly states that MVC waived any claims for additional compensation if it did not give UDOT written notice of the "alleged change" within five days. Nothing in the contract required UDOT to demand such written notice. We hold, therefore, that UDOT did not orally modify the contract's notice provisions.

## C. UDOT Did Not Waive and Is Not Estopped From Asserting That MVC and Southwest Must Comply With the Contract's Notice Provisions

¶ 44 Finally, the trial court found that UDOT "waived and is estopped from asserting that [MVC and Southwest] must strictly comply with the contractual notice provisions." We disagree.

¶ 45 "Waiver is an intentional relinquishment of a known right. It must be distinctly made, although it may be expressed or implied."[28] " 'Waiver of a contractual right occurs when a party to a

---

27. *R.T. Nielson Co. v. Cook,* 2002 UT 11, ¶ 13 n. 4, 40 P.3d 1119.

28. *Flake v. Flake (In re Estate of Flake),* 2003 UT 17, ¶ 29, 71 P.3d 589 (internal quotation marks omitted).

contract intentionally acts in a manner inconsistent with its contractual rights, and, as a result, prejudice accrues to the opposing party or parties to the contract.' " [29] Equitable estoppel requires (1) " 'a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted,' " (2) " 'reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act or failure to act,' " and (3) an " 'injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.' " [30] The trial court found that "[w]hile UDOT did not expressly waive the contractual notice provisions, UDOT's waiver was implied from its conduct." The trial court based its finding of waiver and estoppel on five separate grounds, which we address below.

1. Mr. Squire's Allegedly Incorrect Interpretation of the Contract Did Not Waive UDOT's Right to Demand Written Notice

¶ 46 First, the trial court found that "UDOT waived and is estopped" from asserting that MVC must comply with the contract's notice provisions because Mr. Squire "failed to correctly interpret and misapplied the I–215 Project's asphalt paving specifications" when he limited the use of ribbon paving. We disagree.

■■■■ ¶ 47 As we explained above, the contract permitted Mr. Squire to significantly alter the I–215 Project and obligated MVC to give UDOT written notice within five days of such "alleged changes" to the contract. Thus, MVC's notice obligations *were triggered, not waived,* when Mr. Squire allegedly interpreted the contract's paving specifications incorrectly. Stated another way, Mr. Squire's incorrect interpretation of the paving specifications was a *condition precedent* to MVC's obligation to provide UDOT with written notice of the "alleged change." Conduct that triggers a party's contractual obli-

gation to provide written notice cannot simultaneously waive that contractual obligation. Nor can that conduct reasonably induce the party required to give notice to ignore those contractual obligations. Accordingly, because Mr. Squire's allegedly incorrect interpretation of the contract's paving specifications triggered MVC's obligation to provide written notice of the alleged change and because Mr. Squire did not tell MVC that it was relieved from compliance with the contract's notice provisions, we hold that UDOT neither waived, nor is it estopped from enforcing, the contract's notice provisions.

2. Mr. Squire Did Not Make Any Misrepresentations That Waived or Estopped UDOT's Right to Enforce the Contract's Notice Provisions

■■■ ¶ 48 Next, the trial court found that "UDOT waived and is estopped" from enforcing the contract's notice provisions because Mr. Squire "misrepresented to Southwest's personnel the use and application of the I–215 contract specifications ... on other UDOT highway and interstate projects with similar specifications and requirements." The trial court explained that during a meeting on October 7, 2003, an unnamed UDOT representative told Southwest that "UDOT uniformly prohibited ribbon paving where there was a greater-than-two-inch vertical separation grade" when, in fact, UDOT did allow ribbon paving in areas where there was a greater-than-two-inch grade separation on a different project, specifically at the Interstate 15 Point of the Mountain Project. The trial court noted that Mr. Squire was present at the meeting and did not correct the misrepresentation. Likewise, the trial court found that Mr. Squire misrepresented and misled MVC and Southwest by stating that UDOT did not accept a 5:1 taper on similar jobs when, in fact, a 6:1 or flatter taper was used on the Interstate 15 Point of the Mountain Project and the Interstate 15 Nephi Project. We disagree.

29. *Mid–Am. Pipeline Co. v. Four–Four, Inc.,* 2009 UT 43, ¶ 17, 216 P.3d 352 (quoting *In re Estate of Flake,* 2003 UT 17, ¶ 31, 71 P.3d 589).

30. *Youngblood v. Auto–Owners Ins. Co.,* 2007 UT 28, ¶ 14, 158 P.3d 1088 (quoting *Nunley v. Westates Casing Servs., Inc.,* 1999 UT 100, ¶ 34, 989 P.2d 1077).

¶ 49 The problem with the trial court's findings of waiver and estoppel is that the misrepresentations occurred on October 7, 2003—at least *one week after* the I–215 Project was complete,[31] and nearly four months after MVC was contractually obligated to give UDOT written notice of the alleged ribbon-paving change.[32] But estoppel requires that a party's inaction *be induced by* another party's statement, act, or failure to act.[33] Here, UDOT's misrepresentations had absolutely no impact on MVC's failure to provide timely written notice of the alleged ribbon-paving change because, by the time the misrepresentations were made, the I–215 Project was complete and MVC had already failed to give UDOT timely written notice of the alleged change more than four months earlier.

¶ 50 Likewise, the misrepresentations are irrelevant for the purpose of waiver. "Waiver is an intentional relinquishment of a known right" that "occurs when a party to a contract intentionally acts in a manner inconsistent with its contractual rights." [34] Here, as of June 18, 2003, UDOT had a vested contractual right to enforce the contract's notice procedures against MVC because MVC had failed to give UDOT timely notice of the alleged ribbon-paving change. Because UDOT's misrepresentations in no way purported to waive that right, we hold that the trial court erred when it found waiver based on those misrepresentations.

3. UDOT Did Not Waive Its Right to Rely on the Contract's Notice Provisions by Creating "an Atmosphere of Informality" on the I–215 Project

█ ¶ 51 The trial court also found that "UDOT waived and is estopped" from asserting that MVC must comply with the con-tract's notice provisions because "UDOT created an atmosphere of informality on [the I–215 Project] and other projects" that was inconsistent with UDOT's position that compliance with the contract's notice provisions was required. The trial court reasoned that in response to MVC's and Southwest's verbal complaints about not being able to use ribbon paving, UDOT verbally directed Southwest to continue working rather than demanding MVC to give written notice of the "alleged change" as required by the contract. The trial court concluded that UDOT's verbal responses induced MVC "to reasonably believe that UDOT had waived strict compliance with the contractual notice provisions." We disagree.

¶ 52 As to waiver, we find no evidence that UDOT "act[ed] in a manner inconsistent with its contractual rights." [35] First, the contract does not require UDOT to deal directly with Southwest. Instead, the contract encourages a "strong partnership" between UDOT, MVC, and Southwest and expressly warns that such " 'voluntary partnering' does not change the legal relationship of the parties, [or] relieve either party from any of the terms of the [c]ontract." Thus, regardless of the informal nature of the interactions between UDOT and Southwest, UDOT was entitled to enforce the contract's notice provisions against MVC unless UDOT acted in a way that evidenced a clear intent to relinquish those contractual rights. Here, UDOT did not tell MVC or Southwest that their verbal complaints satisfied the contract's notice provisions nor did UDOT imply that those provisions would not be enforced against MVC. Rather, when presented with Southwest's verbal complaints, Mr. Squire consistently stated that the contract's paving specifications did not permit ribbon paving.

---

**31.** The trial court found that "the Project was completed in late September 2003."

**32.** Section 1.7 of the contract states that MVC must give UDOT written notice of any alleged changes to the contract "within 5 calendar days of the date the change or action was noted." Because Mr. Squire told MVC and Southwest on June 12, 2003, that the contract did not allow ribbon paving, MVC was contractually obligated to give UDOT written notice of the "alleged change" by June 17, 2003.

**33.** *See Youngblood,* 2007 UT 28, ¶ 14, 158 P.3d 1088.

**34.** *In re Estate of Flake,* 2003 UT 17, ¶¶ 29–31, 71 P.3d 589 (internal quotation marks omitted).

**35.** *Mid–Am. Pipeline,* 2009 UT 43, ¶ 17, 216 P.3d 352 (internal quotation marks omitted).

Accordingly, we conclude that UDOT did not waive its right to enforce the contract's notice provisions because it never acted in a manner inconsistent with those rights.

¶ 53 As for estoppel, Lance Harris, MVC's project manager, testified that MVC knew it had to comply with the notice provisions. Thus, even assuming UDOT created an "informal atmosphere," it is clear that such atmosphere did not induce MVC into believing that it was not required to comply with the contract's notice provisions. We conclude, therefore, that the trial court erred when it held that UDOT waived and was estopped from enforcing the contract's notice provisions by creating an "atmosphere of informality."

4. UDOT Did Not Waive the Contract's Notice Procedures When UDOT's Board of Review Recommended That UDOT Deny MVC's Untimely Claim for Additional Compensation

¶ 54 The trial court also held that "UDOT waived [MVC's] obligation to strictly comply with the contract's notice provisions" because the UDOT Claims Board of Review reached the merits of MVC's paving claims without addressing MVC's lack of written notice. The trial court relied on *Procon Corp. v. Utah Department of Transportation,* where the court of appeals observed in a footnote that "UDOT's review of the possible merits of [the plaintiff's] claim [for additional compensation] arguably waived the [plaintiff's] obligation to conform to the [c]ontract's strict notice procedures." [36] The trial court's reliance on *Procon* was misplaced.

¶ 55 To constitute waiver, UDOT had to intentionally act "in a manner inconsistent with its contractual rights, and, as a result, prejudice must accrue[ ] to [MVC]." [37] Here,

when MVC submitted its claim to the Board of Review, UDOT argued that MVC waived any claims for additional compensation arising from the alleged ribbon-paving change because MVC failed to comply with the contract's notice provisions. Although the Board ultimately recommended that UDOT's deputy director deny MVC's claims on the basis that Mr. Squire had correctly interpreted the project specifications, UDOT clearly preserved its claim that MVC had waived any right to additional compensation by failing to provide written notice as required by the contract. Furthermore, the Board's recommendation did not waive UDOT's right to demand compliance with the contract's notice provisions because the trial court's review of MVC's claims was de novo, and the trial court was not, therefore, bound by the Board's recommendation. [38]

¶ 56 Thus, to the degree that *Procon* suggests that UDOT waives a contract's written notice provisions if the UDOT Board of Review resolves a claim against UDOT on other grounds, we disavow that interpretation. The language from *Procon* on which the district court relied never carried the force of law; it is contained in a footnote that merely suggests that "UDOT's review of the possible merits of Procon's claim *arguably* waived Procon's obligation to conform to the [c]ontract's strict notice procedures," [39] and it was not necessary to resolve the issues on appeal in *Procon.* [40] Instead, we clarify that to determine whether UDOT waives a contract's notice provisions, the relevant question is not on what grounds the UDOT Board of Review analyzed or resolved the claim, but whether UDOT "intentionally acts in a manner inconsistent with its contractual rights, and, as a result, prejudice accrues to the opposing party." [41] Because in this case UDOT consistently maintained that MVC waived any

36. 876 P.2d 890, 892 n. 3 (Utah Ct.App.1994).

37. *Mid–Am. Pipeline,* 2009 UT 43, ¶ 17, 216 P.3d 352 (internal quotation marks omitted).

38. *See* UTAH CODE ANN § 63G–4–402(1)(a) (Supp. 2010) ("The district courts have jurisdiction to review by trial de novo all final agency actions resulting from informal adjudicative proceedings.").

39. *Procon,* 876 P.2d at 892 n. 3 (emphasis added).

40. *See, e.g., Bingham v. Roosevelt City Corp.,* 2010 UT 37, ¶ 23, 235 P.3d 730 (explaining that observations in a prior case that were not "indispensable to our reasoning" were dicta and "never carried the force of law").

41. *Mid–Am. Pipeline,* 2009 UT 43, ¶ 17, 216 P.3d 352 (internal quotation marks omitted).

claims for additional compensation when it failed to provide written notice of the alleged ribbon-paving change, we hold that UDOT did not waive its right to demand that MVC comply with those contractual provisions.

5. UDOT's Failure to Use Identical Asphalt Paving Specifications on Similar Projects Did Not Estop UDOT From Asserting That MVC Must Follow the Contract's Notice Provisions

¶ 57 Finally, the trial court held that "UDOT is estopped from asserting that [MVC and Southwest] must strictly comply with the contractual notice provisions as UDOT failed to follow the same asphalt paving specifications on both the I–215 Project and [on another subsequent project, specifically the Interstate] 15 Point of the Mountain Project." Again, the trial court failed to consider the timing of the two projects.

¶ 58 Here, the contract required MVC to notify UDOT in writing within five days of the alleged ribbon-paving change, or by June 17, 2003. But the Interstate 15 Point of the Mountain Project began *after* June 17, 2003. Thus, even assuming UDOT told MVC that ribbon paving was permitted on the Point of the Mountain Project, that representation could not have formed the basis for MVC's failure to comply with the contract's notice provision on the I–215 Project. Likewise, Michael Moehn, vice president of Southwest, testified that Southwest first learned that ribbon paving was allowed on the Interstate 15 Point of the Mountain Project on October 7, 2003, which was *after* the I–215 Project was complete. Thus, by June 17, 2003—the date written notice was due—there was no "statement, admission, act, or failure to act" by UDOT that could have possibly induced MVC to not provide written notice. Because there was no misrepresentation, there was no reliance, and without reliance, there was no resulting damage.

¶ 59 MVC argues, however, that UDOT's repeated directives to proceed with work caused MVC and Southwest "to reasonably believe that there was no need to provide written notice to UDOT since UDOT had already made up its mind on the issue of what paving methods it was going to allow."

We disagree. First, Lance Harris, MVC's project manager, testified that MVC understood it had to comply with the notice provisions, which illustrates that MVC never actually believed there was no need to provide written notice to UDOT. Second, the purpose of giving written notice to UDOT was to ensure that the "alleged change" was reviewed by UDOT's Board of Review and deputy director. Thus, even if Mr. Squire had "made up [his] mind" as MVC asserts, because the UDOT Board of Review had the ultimate say in any dispute, it was not reasonable for MVC to conclude that "there was no need to provide written notice to UDOT." Accordingly, we hold that the trial court erred when it concluded that UDOT was estopped from demanding strict compliance with the contract's notice procedures.

IV. THE TRIAL COURT DID NOT ERR WHEN IT HELD THAT UDOT PROPERLY IMPOSED A PAVING–THICKNESS PENALTY

¶ 60 On cross-appeal, MVC argues that the trial court erred when it held that UDOT properly imposed a paving-thickness penalty. At trial, the parties presented the court with two plausible interpretations of the contract's paving-thickness provisions: UDOT argued that the contract permitted a 3/8–inch deficiency on the *total* five inches of asphalt laid, for a minimum total thickness of 4 5/8 inches; MVC argued that the contract permitted a 3/8–inch deficiency on *each* layer of asphalt laid, for a minimum total thickness of 4 1/4 inches. The trial court concluded that the thickness provisions were "less than clear," but held that UDOT's interpretation was "more reasonable" and denied MVC's claim.

¶ 61 On appeal, MVC and UDOT agree that the thickness provisions are ambiguous. But they disagree as to how the ambiguity should be resolved. MVC argues that the trial court was required to resolve any ambiguity against the drafter of the contract, here UDOT. In contrast, UDOT argues that there was sufficient evidence to support the trial court's conclusion that UDOT had "the more reasonable interpretation."

¶ 62 This issue presents us with a question of contract interpretation, and we first turn our attention to the standard of review. MVC argues that we give the trial court's conclusions no deference because the interpretation of a contract is a question of law. UDOT argues that the trial court's resolution of the ambiguity is reviewed under a deferential standard with "all inferences that may be drawn therefrom in a light most supportive of the findings of the trier of fact." [42]

 ¶ 63 The trial court clearly held that the contract was ambiguous. But the trial court then proceeded to follow an unusual course of action. It did not base its interpretation of the thickness provisions of the contract on extrinsic evidence of the parties' intent. Rather, the trial court simply held that UDOT had the "more reasonable interpretation as otherwise the potential deviation in thickness could be multiplied by the number of layers or lifts and could result in a substantial deviation from the contract requirements." As we explained in *Kimball v. Campbell,*

A contract's interpretation may be either a question of law, determined by the words of the agreement, *or a question of fact, determined by extrinsic evidence of intent.* If a trial court interprets a contract as a matter of law, we accord its construction no particular weight, reviewing its action under a correctness standard. However, if the contract is ... ambiguous *and the trial court proceeds to find facts respecting the intentions of the parties based on extrinsic*

*evidence, then our review is strictly limited.* [43]

Accordingly, because the trial court did not base its conclusion that UDOT's interpretation was "more reasonable" on extrinsic evidence of the parties' intent, we give that conclusion no deference and review for correctness.

 ¶ 64 We begin, as always, with the contract itself. When interpreting a contract, we first look at the plain language to determine the parties' meaning and intent. [44] "A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." [45] If the contract is ambiguous, we seek to resolve the ambiguity by looking to extrinsic evidence of the parties' intent. [46] If extrinsic evidence does not resolve the ambiguity and uncertainty remains, *only then* will we resolve the ambiguity against the drafter. [47]

¶ 65 In this case, the contract states,

A. A lot equals the number of tons of [hot mix asphalt] placed during each production day.

. . .

E. Thickness: Base acceptance on the average thickness of a lot. A thickness lot equals a density lot. Divide a thickness lot into five sublots equal to density sublots....

1. Take a minimum of two randomly selected thickness tests within each sublot.

42. UDOT cites two cases for this proposition. *See Nielsen v. Gold's Gym,* 2003 UT 37, ¶ 7, 78 P.3d 600; *Kimball v. Campbell,* 699 P.2d 714, 716 (Utah 1985).

43. 699 P.2d at 716 (emphases added) (citation omitted).

44. *Glenn v. Reese,* 2009 UT 80, ¶ 10, 225 P.3d 185.

45. *Id.* (internal quotation marks omitted).

46. *Id.*

47. *See Hillcrest Inv. v. Sandy City,* 2010 UT App 201, ¶ 19, 238 P.3d 1067 ("Where there is ambiguity in a written document, the first order of

business is to consider any extrinsic evidence which might resolve the ambiguity. *Only* if extrinsic evidence does not resolve the ambiguity is it appropriate to construe the document against its drafter." (internal quotation marks omitted)); *Express Recovery Servs. Inc. v. Rice,* 2005 UT App 495, ¶ 3 n. 1, 125 P.3d 108 ("When there is an ambiguity in contract language, we turn first to extrinsic evidence in order to determine the intent of the parties. But in the absence of such extrinsic evidence ... *we construe the lingering ambiguities against the drafter as a last resort."* (emphasis added)); *Allstate Enters. Inc. v. Heriford,* 772 P.2d 466, 469 (Utah Ct.App.1989) ("If a contract is ambiguous, the court will construe it against the drafter *only after* concluding that extrinsic evidence does not reveal the intent of the parties and uncertainty remains." (emphasis added)).

2. The same core samples taken for density may be used for thickness verification.

3. [UDOT] accepts a lot when:

a. The average thickness of all sublots is not more than 1/2 inch greater nor 1/4 inch less than the total thickness specified.

b. No individual sublot shows a deficient thickness of more than 3/8 of an inch.

¶ 66 A separate specification provided that the total thickness of the asphalt had to be five inches. But the parties also agreed that the five inches would be laid in two lifts on two production days—a first lift of two inches and a second lift of three inches. The issue then, is whether the contractual provisions allowed a 3/8-inch deficiency on the *total* five inches of pavement or on *each* of the two lifts.

¶ 67 We agree with the trial court that the contract is ambiguous. On one hand, UDOT's position is reasonable. The contract requires UDOT to accept a lot when "[t]he average thickness of all sublots is not more than 1/2 inch greater nor 1/4 inch less than *the total thickness specified*" and "[n]o individual sublot shows a deficient thickness *of more than 3/8 inch.*" Since the parties ultimately agreed that the pavement must be five inches thick, it is reasonable to conclude that the 3/8-inch deficiency applied to that total thickness.

¶ 68 On the other hand, the contract also supports MVC's position. A "lot" is defined as "the number of tons of [hot mix asphalt] *placed during each production day.*" And the contract equates a thickness lot with a density lot and instructs UDOT to "divide a thickness lot into five sublots equal to density sublots." The contract then states that "UDOT accepts a lot when … [n]o individual sublot shows a deficient thickness of more than 3/8 inch." Because the parties agreed that the asphalt would be laid in two lifts on two days, the two-inch lift could be easily understood to constitute one "sublot," while the three-inch lift constituted another "sublot." Thus, the contract can reasonably be interpreted as permitting a 3/8-inch deficiency on each lift.

¶ 69 MVC argues that we must resolve this ambiguity against the drafter of the contract, here UDOT. But MVC ignores a critical analytical step. Typically, when a trial court concludes that contractual language is ambiguous, the court will invite extrinsic evidence bearing on the intentions of the parties to the contract concerning the ambiguity.[48] The court would then assess the merits of the extrinsic evidence and reach a conclusion about the intentions of the parties. *Only if* the court concludes that the extrinsic evidence does not reveal the intent of the parties and uncertainty remains will the court construe the ambiguity against the drafter.[49] Here, the trial court did not consider any extrinsic evidence bearing on the parties' intent. Instead, the court cursorily concluded that UDOT's interpretation was "the more reasonable interpretation, as otherwise the potential deviation in thickness could be multiplied by the number of layers or lifts and could result in a substantial deviation from the contract requirements." Although the trial court did not follow the typical methodology for resolving contract ambiguities, we agree that the record cannot reasonably support MVC's interpretation of the contract that would allow an exponential deviation in thickness based on the number of layers, and we decline MVC's invitation to resolve the ambiguity against UDOT.

¶ 70 At trial, the court noted that there was no evidence of any past practice that would support MVC's interpretation and explained that MVC's interpretation would be problematic in a three-lift situation. The testimony of Mike Moehn, Southwest's vice president, strikes us as particularly relevant. Mr. Moehn testified that MVC and Southwest were able to "make up" any thickness deficiency in the bottom lift "on subsequent lifts" and that Southwest actually tried to make up the bottom lift's deficiency on the top lift in order to reach the total five inches of pavement. But this could only be true if the parties intended for the thickness penalties to be determined based on the total

---

**48.** *See supra* note 47.

**49.** *See supra* note 47.

thickness of the five inches of paved surface. Mr. Moehn also testified that a 10 percent thickness deviation is industry standard. When the trial court noted that a 3/8–inch deviation on each lift is closer to a 15 percent deviation, MVC's counsel agreed that 15 percent "is a big tolerance from a practical standpoint in the field." In the same vein, when the court asked MVC's counsel whether Southwest would be entitled to a 3/8–inch deviation on three lifts, UDOT's counsel responded, "I would say that is too much of a tolerance ... but I would also say that the way the specification is written is yes, it would be, if you enforce the specification as written. But as a practical matter in the field, that does not pass the smell test to me."

¶ 71 Finally, we credit the testimony of Mr. Squire, UDOT's project engineer. Mr. Squire testified that prior to the completion of the I–215 Project, neither MVC nor Southwest gave notice that they disagreed with UDOT's interpretation of the contract's thickness provisions. Mr. Squire also testified that at a meeting on September 18, 2003, he informed MVC and Southwest that several thickness cores were deficient and that MVC and Southwest were aware of how UDOT was measuring the thickness deficiency because they had taken the cores themselves and because the parties were discussing a deficiency in the "four and five-eighths and four and a half range." Moreover, Mr. Squire testified that UDOT did not send out any price reductions on the bottom lift at that time because "they had an opportunity to make it up in the top lift."

¶ 72 Based on this testimony, we conclude that the record cannot support MVC's interpretation of the contract that would allow a 3/8–inch deficiency on each lift of pavement. We therefore affirm the trial court's denial of MVC's paving-thickness claim.

### CONCLUSION

¶ 73 Because UDOT was permitted to alter the I–215 Project, UDOT did not breach its contract with MVC when it forbade MVC and Southwest from using ribbon paving. Rather, MVC waived any right to additional compensation arising from the "alleged

change" because it did not comply with the contract's notice procedures. We therefore reverse the decision of the trial court and instruct the trial court to enter judgment in favor of UDOT.

¶ 74 As to MVC's cross-appeal, we conclude that the contract's paving-thickness provisions are ambiguous. However, the record cannot reasonably support MVC's interpretation of the contract that would permit a 3/8–inch deficiency on each lift and, as a result, an exponential deviation based on the number of layers of pavement. We therefore affirm the trial court's denial of MVC's paving thickness claim.

¶ 75 Associate Chief Justice DURRANT, Justice PARRISH, and Judge SHUMATE concur in Justice NEHRING's opinion.

¶ 76 District Court Judge JAMES L. SHUMATE sat.

¶ 77 Justice THOMAS R. LEE became a member of the Court on July 19, 2010, after oral argument in this matter, and accordingly did not participate.

Chief Justice DURHAM, concurring in the result:

¶ 78 I concur in the majority opinion's result of reversing the trial court's judgment against UDOT. However, I do not believe it is necessary to address the issues of whether UDOT breached its contract with MVC or whether MVC waived its claims by failing to comply with the contract's written-notice provision. Instead, I would hold that Southwest could not, as a matter of law, recover its own damages by virtue of MVC's assignment of claims.

¶ 79 UDOT contends that Utah law does not permit an assignee (Southwest) to recover its own damages by standing in the shoes of its assignor (MVC). Recognizing its failure to preserve this issue below, UDOT asks us to engage in a plain error review, under which UDOT "must establish that [1] an error exists; [2] the error should have been obvious to the trial court; and [3] the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome" for UDOT. *State v. Munguia*, 2011

UT 5, ¶ 12, 253 P.3d 1082 (internal quotation marks omitted). I believe that UDOT has met these three requirements.

¶ 80 First, an error exists in light of our controlling decision in *SME Industries, Inc. v. Thompson, Ventulett, Stainback & Associates, Inc.*, 2001 UT 54, 28 P.3d 669. In that case, SME was assigned Salt Lake County's claims against TVSA, an architectural and consulting firm involved in the expansion of the Salt Palace Convention Center. *Id.* ¶¶ 2, 6. In discussing whether SME could pursue a claim for breach of implied warranty against TVSA, we stated that because SME was an assignee, it could not pursue damages it suffered as a result of TVSA's alleged breach. *Id.* ¶ 30. Rather, we explained that SME's recovery was limited to damages its assignor, the County, suffered. *Id.* We supported this reasoning by citing to 6 AM. JUR.2D *Assignments* § 144 (1999) for the proposition that an "assignee can acquire no right superior to those held by the assignor" and " 'simply stands in the shoes of the assignor.' " *Id.*

¶ 81 Under *SME Industries*, an assignee not otherwise in privity of contract with an obligor is constrained to pursuing damages its *assignor suffered* for claims its *assignor could have asserted* against the obligor. Here, Southwest pursued damages *it suffered* for claims *MVC could have asserted* against UDOT. Southwest did not stand in MVC's shoes, but rather wore a "Southwest shoe" on one foot and an "MVC shoe" on the other. The trial court therefore erred in awarding Southwest its own damages based on MVC's assignment of claims against UDOT.[1]

¶ 82 Under plain error review, our second task is to determine whether the error should have been obvious to the trial court.

"An error is obvious when the law governing the error was clear at the time the alleged error was made." *State v. Low,* 2008 UT 58, ¶ 41, 192 P.3d 867 (internal quotation marks omitted). We issued *SME Industries* in 2001, well before the trial court's ruling. The legal error, therefore, should have been obvious to the trial court.

¶ 83 The majority contends that even if legal error existed, it would not have been factually obvious to the trial court. It concedes that the trial court understood that Southwest had incurred all the damages and that MVC had no "dog in this fight." *See supra* ¶ 20. But it states that the trial court's "limited factual knowledge about the parties' interests was not sufficient" to put it on notice of a legal error. *Id.* Yet the record in this case demonstrates that the testimony at trial repeatedly and clearly put the court on notice that (1) Southwest was pursuing its claims in the name of MVC pursuant to a pass-through/assignment of claims agreement, and (2) Southwest was not a party to the construction contract between MVC and UDOT. MVC's own counsel even informed the trial court that only Southwest suffered damages and that "this is not ... [MVC's] ball game, this is Southwest['s].... I think that needs to be clear in case ... the decision is appealed." On appeal, we should therefore recognize that the trial court had the factual basis to understand the parties' interests and that the error should have been obvious.

¶ 84 Finally, plain error requires a showing of harm. That Southwest recovered its own damages despite its assignee status certainly harmed UDOT. Had the trial court applied the law as set forth in *SME Industries,* UDOT would not have been assessed a judgment of $768,365.

---

1. The majority opinion disagrees that error exists because this court has never addressed "whether an assignee can assert a breach of contract claim in the name of its assignor when the assignee agrees not to sue the assignor in exchange for the assignor's right to sue the obligor." *Supra* ¶ 19. As an initial matter, I do not believe that this statement accurately reflects the issue before us. The issue is whether an assignee may recover its own damages in the name of an assignor who suffered no damages. Additionally, I believe

*SME Industries* does address the issue as the majority opinion frames it. SME received its assigned claims by way of settlement and still was limited to recovering the damages of its assignor. *SME Industries,* 2001 UT 54, ¶ 6, 28 P.3d 669. That the parties in *SME Industries* settled implies that they extinguished their claims against one another. *See* BLACK'S LAW DICTIONARY 1496 (9th ed. 2009) (defining "settlement" as "[a]n agreement ending a dispute or lawsuit"). In other words, SME agreed not to sue its assignor in exchange for the right to sue TVSA.

¶ 85 Accordingly, I would hold that the trial court committed plain error in awarding Southwest its own damages as MVC's assignee.[2]

---

**2.** Resolving this case on the assignment issue also would render it unnecessary for us to discuss whether UDOT's actual notice of the increased costs of block paving excused MVC's failure to provide written notice. The majority assumes that because MVC failed to provide written notice in accordance with the contract, MVC necessarily waived its claims. Yet we have never addressed whether a contracting party must strictly comply with a written-notice provision where the party can prove actual notice. *Thorn Construction Co. v. Utah Department of Transportation,* 598 P.2d 365 (Utah 1979), which the majority correctly distinguishes, did not reach this issue because we found that the written-notice provision of the contract was not triggered. *Id.* at 370. Furthermore, there is some disagreement in other jurisdictions as to whether a party to a contract may be excused for failing to comply with a written-notice provision by proving actual notice. *Compare B & P Enters. v. Overland Equip. Co.,* 133 Md.App. 583, 758 A.2d 1026, 1041 (2000) (disregarding lease's written-notice requirement where appellant had "actual, ongoing knowledge" of appellee's complaints and appellant suffered no prejudice), *with Alkan v. Wheeler,* 142 Wash.App. 1013, 2007 WL 4489332, at *3 (Wash.Ct.App. Dec. 24, 2007) ("Washington law generally enforces contractual notice provisions unless those procedures are waived. When a contract requires written notice, actual notice does not suffice." (citation omitted)).